1
2
3
4
5
6
7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARL WAYNE CAVALLI,

11          Petitioner,              No. 2:06-cv-01700 ALA HC

12      vs.

13   MICHAEL MARTEL, Warden,[1]

14          Respondent.             <u>ORDER</u>

15   _____/

16      Pending before the Court are Carl Cavalli's ("Petitioner") application for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254(a) (doc. 1), Respondent's Answer (doc. 8), and Petitioner's

18   Reply, which he labeled "Traverse" (doc. 9).  Also before the Court are the parties' briefs filed

19   in response to this Court's December 19, 2007 Order requesting additional briefing on the

20   applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007) to this matter.  For the reasons

21   discussed below, Petitioner's application is denied.

22                          **I**

23                          **A**

24   _____

25      [1]Michael Martel is substituted for his predecessor, Roseanne Campbell, as the warden
     where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil
26   Procedure.

1    On June 4, 1981, the Colusa County Superior Court found Petitioner guilty of the

2  following crimes: (1) robbery, with enhancements for the use of a firearm, being armed with a

3  firearm, and having served three prior prison terms, in violation of California Penal Code § 211;

4  (2) grand theft auto, in violation of California Penal Code § 10851; (3) carrying a concealed

5  weapon without a license, in violation of California Penal Code § 12025; (4) first degree murder,

6  with enhancements for having served three prior prison terms in violation of California Penal

7  Code §§ 187 and 189; and (5) manslaughter, with enhancements for having served three prior

8  prison terms in violation of California Penal Code § 192(c).  He was sentenced to 28 years to

9  life.  Petitioner filed a direct appeal from the judgment.  The California Court of Appeal

10  affirmed.

11                                              **B**

12    The probation report prepared for the trial court's sentencing proceedings described

13  Petitioner's crimes as follows:

14    On December 1, 1980 at approximately 1:34 p.m. the Lake County
     Sheriff's Office received a report of an armed robbery that had just
15    taken place at the Bank of America in Clearlake Highlands.
     Detectives Stein and Jolliffe arrived at the bank and spoke with
16    Violet Packer.  Mrs. Packer stated that she had returned from lunch
     at approximately 1:10 p.m. and bandaged her finger before
17    returning to her window.  She resumed working at approximately
     1:20 p.m.  She had completed one business transaction with a
18    customer and then was approached by the defendant.  He stated: "I
     want all of your money."  She thought that the defendant was
19    joking.  She turned to look at a teller, Mrs. Jones, next to her as she
     thought Mrs. Jones had said something to her.  As she looked at
20    Mrs. Jones, Mrs. Packer saw the defendant slide something on the
     counter toward her.  When she turned back toward him, he said, "I
21    mean right now."  She told him that she did not have very much
     money and opened the cash drawer and showed him.  She then
22    took out all of the money, including a bundle of money referred to
     as marked or bait money.  The bait money was kept beneath the
23    twenty dollar bills and consists of twenties, fives, two's and one's.
     The serial numbers and year printed had been previously recorded
24    by the bank.

25    The defendant had placed a tan leather cylindrical container on the
     counter for her to place the money in.  Due to the injury to her
26    finger, she was unable to use it so simply handed the money to the

2

defendant.  He took the money and slid it in the container.  As he did, Mrs. Packer saw a small hand gun that he had concealed beneath his right hand.  She had seen the front part of the barrel prior to this time but at this point she saw the remaining part of the gun.  She described the gun as having an antique finish and the caliber larger than a .22 caliber weapon.

After the defendant put the money in the tube container, he removed the gun from the counter with his right hand which then dropped below the counter.  He removed the container with the money in it, turned and walked toward the front door.  As he turned away, Mrs. Packer activated the alarm.  As he walked through the main door of the bank, Mrs. Packer went to an area next to the door.  This area is concealed from the main lobby area by a wall that is approximately seven or eight feet high.  She got up on a stool and looked over the wall and saw the defendant just after he walked through the main door.  She noticed that he was approximately six feet tall, 180-185 pounds, 28-32 years old, had brown hair, a mustache, and medium complexion.

As another teller, Mrs. Scavone, was leaving the bank she noticed Mrs. Packer standing on a stool.  She asked what she was doing.  Mrs. Packer stated that she was looking for the direction that "he" went.  Mrs. Scavone asked, "Who?"  Mrs. Packer replied, "I've just been robbed."

Unable to do anything further, Mrs. Scavone left the bank and went to her car.  As she was going to the post office she noticed a blue "240 Z" Datsun pull along side of her.  There were four vehicles in front of Mrs. Scavone as well as a transit bus.  She noticed that the automobile was traveling at a high rate of speed.  She slowed to allow the Datsun to pull in front of her as another car was approaching.  The vehicle continued on.  The car narrowly missed hitting the oncoming automobile.  At this time, Mrs. Scavone realized that there might be a connection between the blue Datsun and the bank robbery.  Instead of stopping at the post office, Mrs. Scavone continued in an attempt to obtain a license plate number, however the vehicle was nowhere in sight.  Mrs. Scavone then stopped at Fidelity Savings and called the Bank of America and provided the bank officials the information.  At approximately 1:55 p.m. Deputy Kaerth was notified of a robbery suspect possibly traveling through Colusa County on Highway 20 in a blue Datsun "240 Z".  He was also informed that the driver should be a male approximately 34 years old with black hair and a mustache, and that there should be a female with him.  He was advised that approximately $1000.00 (one thousand dollars) was taken during the robbery and that the driver was armed with a two inch silver handgun.  He then proceeded Westbound on Highway 20 to attempt to locate the vehicle.  Approximately ten minutes later he observed a blue "240 Z" traveling Eastbound at a high rate of speed.  He then made a U-turn and attempted to overtake the

1   vehicle.  Deputy Kaerth was traveling in excess of 100 (one
    hundred) miles an hour.  He was joined by the California Highway
2   Patrol and continued to pursue the vehicle until it failed to
    negotiate a corner and crashed.  Both the driver and the passenger
3   were ejected from the vehicle.  After seeing that both persons were
    receiving first aid Deputy Kaerth began to secure the scene of the
4   accident and collect pertinent evidence.  The male person was
    identified as Carl Wayne Cavalli and the female person was
5   identified as Judy Marie Vallero.  Deputy Kearth identified the
    male person as the driver of the Datsun as it passed him.

6
    Located at the scene of the accident was a blue denim cap, a brown
7   vinyl tube containing U.S. currency, a black and silver knife, and a
    brown purse.  On Mr. Cavalli a semi-automatic hand gun was
8   located and removed.  Both Mr. Cavalli and Ms. Vallero were
    transported to Eskaton Healthcare Center in Colusa by ambulance.
9   Ms. Vallero was dead on arrival.

10                                  **C**

11      On January 20, 2005, the California Board of Prison Terms ("BPT") determined that

12   Petitioner was suitable for parole, and that he "would not pose an unreasonable risk of danger to

13   society or a threat to public safety if released from prison."  BPT January, 2005 Decision at 63.

14   On May 31, 2005, Governor Schwarzenegger reversed the grant of parole because, "based upon

15   the gravity of the murder he committed, his lengthy criminal history, and his failure to

16   sufficiently address his long history of drug addiction, Mr. Cavalli would pose an unreasonable

17   risk to public-safety if released from prison at this time."

18      The Governor's decision reads as follows:

19         On December 1, 1980, Carl Cavalli entered a bank armed with a
           handgun, approached a teller, and demanded money.  When the
20         teller gave Mr. Cavalli all the money in her cash drawer,
           approximately $1000, she noticed he had a small handgun
21         concealed beneath his hand.  Mr. Cavalli took the money and left.
           The teller activated the alarm and told another bank employee
22         what had happened.  After the bank employee left work, she saw a
           car that she suspected was connected to the bank robbery and
23         provided a description of the car to officials.

24         After leaving the bank, Mr. Cavalli stopped by his motel room,
           picked up a friend, Judy Vallero, and got back on the road.  Within
25         minutes, a sheriff's deputy identified Mr. Cavalli's speeding car
           from the bank employee's description and began following him.  A
26         chase ensued that reached speeds in excess of 100 miles per hour.

                                         4

California Highway Patrol eventually joined the deputy's attempt to apprehend Mr. Cavalli. During the high-speed chase, Mr. Cavalli failed to negotiate a corner and crashed his car. Both he and Ms. Vallero were ejected from the car and then transported to a nearby hospital. Ms. Vallero was pronounced dead upon her arrival.

Mr. Cavalli was arrested the next day, and following a jury trial, was convicted of first-degree murder, manslaughter by motor vehicle, robbery with the use of a firearm, carrying a concealed weapon, and vehicle theft. He was sentenced to 25 years to life in prison for first-degree murder, plus a three-year enhancement for having three prior felony convictions. His sentences for the other convictions, totaling 10 years, were ordered to run concurrent with the life offense.

Mr. Cavalli was 33 years old when he murdered Ms. Vallero, but his criminal history began at age 18. He was convicted of taking a vehicle for temporary use, robbery, drug possession, buying or receiving stolen property, and burglary, and at various times sentenced to jail, prison, or California Youth Authority facilities. Furthermore, he escaped from custody on four separate occasions. After being convicted of an additional first-degree robbery and sentenced to five years to life in prison at age 28, Mr. Cavalli was ultimately discharged from parole less than 10 months prior to Ms. Vallero's murder. After committing the life offense, Mr. Cavalli was also convicted of armed robbery for an unrelated crime and sentenced to seven years in prison. Mr. Cavalli's criminal history is also marked by arrests - for which he was not convicted - for burglary, conspiracy to commit petty theft, forgery or fraudulent possession of a check, and possession of hypodermic needles. It is apparent that even after numerous convictions and several terms of incarceration, along with multiple terms of probation and parole, Mr. Cavalli was unable or unwilling to curb his conduct within the parameters of the law. His long and deplorable criminal history is a negative factor weighing against his parole.

Once Mr. Cavalli entered prison, his conduct did not immediately improve. During his first 15 years of incarceration, he was disciplined nine times for prison rules-violations; three of those violations were related to drugs or alcohol. In 1983, Mr. Cavalli was disciplined when a correctional officer found inmate-manufactured alcohol in his cell. In 1989, he was disciplined for conduct conducive to violence based on reliable, confidential information that he was in debt to other inmates for drug purchases. And in 1994, Mr. Cavalli was disciplined for testing positive for THC. Additionally, according to confidential information in his prison file that was also deemed reliable, Mr. Cavalli was suspected - but not disciplined - in 1995 of again owing money to other inmates for drug purchases. Moreover, throughout his incarceration, Mr. Cavalli has been counseled nine

times for minor misconduct, and was alleged, according to more confidential and reliable information in his file, to have participated in a confrontation between Caucasian and African-American inmates in 1993.

To his credit, Mr. Cavalli has remained discipline-free since 1995. Additionally, per his statements to the 2005 Board, he has not used drugs since that time. He told the 2005 Board that he became a drug addict in the early seventies, that he was under the influence of drugs on the day of the life offense, and that all of the crimes he committed, including the bank robbery, were to supply his drug habit. Clearly, drugs played a major role in his life both before and after he entered state prison. In 1995, however, he began to participate in the Substance Control Program and did so until 1996. Thereafter, he participated in Narcotics Anonymous from 1999 through 2001 and Christian 12 Step in 2002. Despite these gains, there is no indication in the record before me that Mr. Cavalli has continued to address his history of drug addiction within the past few years. Although he told the 2005 Board he had religious conflicts with the 12 Steps and that his religious beliefs now keep him drug-free, Mr. Cavalli has only spent a total of six years participating in any substance-abuse programming. I do not believe that his programming has been adequate given his long history of drug addiction and crimes motivated by that addiction, including the bank robbery that led to Ms. Vallero's murder. Given his limited programming, especially is total lack of programming within the past few years, I do not believe he could be released from prison at this time without posing an unreasonable risk to public safety.

Apart from his drug abuse programming, Mr. Cavalli has made some effort to improve his ability to function within the law upon release. He has earned a GED, received vocational training in cabinetmaking and small engine repair, and has held several skilled institutional jobs. In addition to his substance abuse programming, he has participated in self-help and therapy programs, including Convicts Who Care, Framework for Recovery, R.O.C.K. Program, and religious programs. And in recent years, he has received positive evaluations from mental-health and correctional professionals. Furthermore, Mr. Cavalli has made confirmed plans for parole to live with his wife in Butte County and perform contract work as a cabinetmaker.

Mr. Cavalli told the 2005 Board that he accepts responsibility and is sorry for Ms. Vallero's death. This is certainly progress given that his 1998 Life Prisoner evaluator noted Mr. Cavalli claimed he should never have been charged with first-degree murder. But the gravity of the senseless murder Mr. Cavalli committed cannot be overlooked. Fleeing from an armed bank robbery with Ms. Vallero as his passenger, Mr. Cavalli chose to attempt to evade authorities in a high-speed car chase instead of safely surrendering

because, as he told the 2005 Board, he "thought [he] could get away."  At speeds in excess of 100 miles per hour, he drove his car until he crashed.  Mr. Cavalli's actions demonstrated disregard for the safety of numerous individuals that day, including the officers in pursuit, and set the stage for Ms. Vallero's tragic death.  His conduct could have resulted in injury or death to any number of people who were in the vicinity of his speeding vehicle.

Mr. Cavalli has now served less than 25 years of his 28-to-life sentence, and after carefully considering the very same factors the Board must consider, I believe that, based upon the gravity of the murder he committed, his lengthy criminal history, and his failure to sufficiently address his long history of drug addiction, Mr. Cavalli would pose an unreasonable risk to public-safety if released from prison at this time.

Petitioner filed a state petition for a writ of habeas corpus before the Colusa County Superior Court challenging the Governor's May 31, 2005 decision.  The Colusa County Superior Court denied his petition on December 13, 2005.

The Colusa County Superior Court's order reads as follows:

Petitioner, a state prisoner incarcerated at Mule Creek State Prison, Ione, California, filed a Petition for Writ of Habeas Corpus on November 23, 2005.  The Court applies the "some evidence" standard to review the reversal-of-parole-suitability finding by the Governor.  (See *In re Rosenkrantz* (2002) 29 Cal. 4th 616, 625).  Under the "some evidence" standard, the Governor's decision will be upheld as long as there is "some basis in fact" for the decision.  The record shows that the Governor considered the gravity of the murder committed by Mr. Cavalli, his lengthy criminal history, and his failure to sufficiently address his long history of drug addiction.  The Governor's finding that Mr. Cavalli would pose an unreasonable risk to public safety if released from prison at this time is supported by some evidence in the record.  Accordingly, the Petition for Writ of Habeas Corpus is denied.

Petitioner filed a petition for a writ of habeas corpus before the California Court of Appeal for the Third Appellate District.  That court summarily denied the petition on March 9, 2006.  Petitioner then filed a petition for review before the California Supreme Court.  That court summarily denied the petition for review on May 24, 2006.  Petitioner filed an application for a writ of habeas corpus in this Court pursuant to 28 U.S.C. § 2254(a) on August 2, 2006.

**II**

7

Before this Court, Petitioner contends that he is entitled to habeas relief on discrete grounds.  First, he alleges that the Governor violated his federal constitutional rights under the Eighth and Fourteenth Amendments because he did not base his decision on some evidence demonstrating that he was unsuitable for release on parole.  Second, he alleges that his due process rights were violated because the Governor is not a fair or impartial decision-maker.

An application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a)  "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of  the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## A

Challenges to parole denials are construed as procedural due process claims.  "'A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections.'" *McQuillion v. Duncan*, 306 F.3d 895, 900 (9th Cir. 2002) (quoting *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998)).

## B

Citing Ninth Circuit authority, Petitioner contends that he is entitled to relief because a California prisoner has a liberty interest in being released on parole protected by the Due Process Clause of the Fourteenth Amendment.  In his answer, Respondent maintains that no decision of the United States Supreme Court has held that a state prisoner has a federally protected interest in release on parole.  The Ninth Circuit has held that "California's parole scheme gives rise to a

1   cognizable liberty interest in release on parole." *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d,

2   1123, 1127-28 (9th Cir. 2006).  This Court is bound by that conclusion.  *See Zuniga v. United*

3   *Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted) ("District courts are, of course,

4   bound by the law of their own circuit, and 'are not to resolve splits between circuits no matter

5   how egregiously in error they may feel their own circuit to be.'").

6   **C**

7       In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that

8   "revocation of good time does not comport with 'the minimum requirements of procedural due

9   process,' unless the findings of the prison disciplinary board are supported by 'some evidence' in

10   the record."  (Citation omitted).  The Ninth Circuit has held that *Hill*'s some evidence standard

11   applies to parole release proceedings.  *Sass*, 461 F.3d at 1128-29; *see Irons v. Carey*, 505 F.3d

12   846, 851 (9th Cir. 2007) ("the Supreme Court ha[s] clearly established that a parole board's

13   decision deprives a prisoner of due process with respect to this interest if the board's decision is

14   not supported by 'some evidence in the record,' . . . or is 'otherwise arbitrary'").  In his response

15   to this Court's December 19, 2007 Order for supplemental briefing regarding the applicability, if

16   any, of *Irons* in this matter, Respondent argues that because the Supreme Court has never

17   applied the some evidence test to a parole decision, this Court is not required to follow *Irons*.

18   This Court must apply the Ninth Circuit's holding in *Sass* and *Irons* that the some evidence

19   standard applies in parole release decisions.  *See Zuniga*, 812 F.2d at 450.  Therefore, the

20   question before the Court is whether the Governor's decision to reverse the BPT was supported

21   by some evidence.

22       Petitioner argues that the Governor's decision was not supported by some evidence

23   because it was based solely on the nature of Petitioner's commitment offense and his criminal

24   history.  He claims that *Irons* stands for the proposition that a due process violation will result if

25   parole is denied based on "an unchanging factor, [such as] the circumstances of the offense and

26   conduct prior to imprisonment."  The Ninth Circuit's decision in *Irons* does not support this

9

1  proposition.    In *Irons*, the Ninth Circuit held that

2  >    where, as here, there is some evidence to support a finding that
3  >    "the offense was carried out in a manner which demonstrates an
   >    exceptionally callous disregard for human suffering" and the
   >    "motive for the crime is inexplicable or very trivial in relation to
4  >    the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we
   >    cannot say that the state court unreasonably applied *Hill*'s "some
5  >    evidence" principle.

6  *Irons*, 505 F.3d at 853.  In *Irons*, the record showed that the BPT relied on the commitment

7  offense in determining that the prisoner was unsuitable for release on parole.  *Id.* at 852.

8       The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d

9  at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today,

10 therefore, is that, given the particular circumstances of the offenses of these cases, due process

11 was not violated when these prisoners were deemed unsuitable for parole prior to the expiration

12 of their minimum terms."  505 F.3d at 853-54.  In an unusual comment in *Irons*, the panel

13 expressed its aspiration that some future court decision will conclude that the BPT has the duty

14 to grant parole where "there was substantial evidence in the record demonstrating rehabilitation."

15 *Id.* at 854.

16      The Court stated:

17 >    We hope that the Board will come to recognize that in some cases,
   >    indefinite detention based solely on an inmate's commitment
18 >    offense, regardless of the extent of his rehabilitation, will at some
   >    point violate due process, given the liberty interest in parole that
19 >    flows from the relevant California statutes.

20 *Id.*

21      The *Irons* panel did not cite any authority to support its prognostication that a state

22 court's denial of habeas corpus relief, under such circumstances, would be "contrary to, or

23 involve[] an unreasonable application of clearly established Federal law, as determined by the

24 Supreme Court of the United States" in violation of 28 U.S.C. § 2254(d)(1).  No presently

25 binding Ninth Circuit decision has fulfilled the prediction of the *Irons*'s panel.

26      In the precedential portion of the *Irons* decision, the court held that "we must look to

California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence' . . . constituted an unreasonable application of the 'some evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851. A prisoner's commitment offense, on its own, may justify parole denial if "the Board can 'point to factors beyond the minimum elements of the crime for which the inmate was committed' that demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if released." *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)). An offense committed in an especially heinous, atrocious or cruel manner is a factor tending to show unsuitability for release. Cal. Code. Regs., tit. 15 § 2402(c)(1).

Contrary to Petitioner's argument, the BPT and the Governor may rely on unchanging factors to find that an inmate is unsuitable for parole. Therefore, this Court turns to the question whether some evidence supported the Governor's May 31, 2005 decision to deny parole release to the Petitioner.

### III

### A

As a preliminary matter, this Court will address Petitioner's allegation that the Governor's procedure in denying him a parole release date violated his federal due process rights. "Petitioner asserts that without an articulated and required standard of proof, any decision the Governor makes is arbitrary and capricious because it is based upon a standardless evidentiary process." Pet'r Mem. Supp. Pet. 24. This contention is unmeritorious. Pursuant to California law, the Governor's decision must also be supported by some evidence. The Governor applies the same factors the BPT applies in determining whether to "affirm, modify, or reverse a Board order granting or denying parole on a murder sentence." Cal. Const. art. V, § 8; *In re Dannenberg*, 34 Cal. 4th 1061, 1086 (2005). For this reason, the Court reviews the

1  Governor's decision according to the principles applicable to cases in which the BPT has denied

2  parole.

3  **B**

4  Petitioner contends his federal due process rights were violated, and that he is entitled to

5  be released on parole, because there is no evidence to support the Governor's decision that he

6  would pose an unreasonable risk to public safety if released from prison.

7  As discussed above, pursuant to *Irons*, "we must look to California law to determine the

8  findings that are necessary to deem a prisoner unsuitable for parole, and then must review the

9  record in order to determine whether the state court decision holding that these findings were

10  supported by 'some evidence' . . . constituted an unreasonable application of the 'some

11  evidence' principle articulated in *Hill*, 472 U.S. at 454." *Irons*, 505 F.3d at 851.  A prisoner's

12  commitment offense, on its own, justifies parole denial if "the Board can 'point to factors

13  beyond the minimum elements of the crime for which the inmate was committed' that

14  demonstrate the inmate will, at the time of the suitability hearing, present a danger to society if

15  released."  *Id.* at 852 (quoting *Dannenberg*, 34 Cal. 4th 1061,1071 (2005)).  Thus, pursuant to

16  *Irons,* the Governor may rely on unchanging factors to find that an inmate is unsuitable for

17  parole.

18  Section 3041(b) provides that the BPT

19  "shall set a release date unless it determines the gravity of the
offense or offenses, or the timing and gravity of current or past
20  convicted offense or offenses, is such that consideration of the
public safety requires a more lengthy period of incarceration for
21  this individual, and that a parole date, therefore, cannot be fixed at
this meeting."

22

23  Section 2402 of the California Code of Regulations sets forth the circumstances that tend

24  to show unsuitability for parole release.  Section 2402(c)(1) provides the nature of a commitment

25  offense may justify denial if the "prisoner committed the offense in an especially heinous,

26  atrocious or cruel manner."

The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

The Governor's findings are sufficient to demonstrate that Petitioner is unsuitable for parole pursuant to Cal. Pen. Code § 3041(b) and Cal. Code Regs. tit. 15, § 2402.  The Governor reversed the BPT's decision to set a release date because he found that "Mr. Cavalli would pose an unreasonable risk to public-safety if released from prison at this time."  The probation officer's report considered by the Governor demonstrated that Petitioner's commitment offense was carried out in an especially heinous, atrocious or cruel manner.  The Governor found that "the gravity of the senseless murder . . . cannot be overlooked.  Mr. Cavalli's actions demonstrated disregard for the safety of numerous individuals that day . . . ."  The Governor described the murder as "senseless" because Petitioner "chose to attempt to evade authorities in a high speed car chase instead of safely surrendering because . . . he 'thought [he] could get away.'"  The Governor identified the aspects of the offense which go beyond the minimum elements required to prove first degree felony murder.  Therefore, the Governor's finding that Petitioner's crime was carried out in an especially heinous, atrocious or cruel manner is supported by some evidence.

While the Governor does not state how Petitioner's institutional behavior weighed in his decision that he was unsuitable for release on parole, he does identify Petitioner's serious misconduct in prison.  *See* § 2402(c)(6) (stating that serious misconduct in prison is a circumstance tending to indicate unsuitability).  The Governor's finding that Petitioner received nine rules violations in his first fifteen years in prison, including three related to drugs and

1    alcohol, is supported by some evidence.

2         The Governor also properly considered Petitioner's criminal conduct prior to the

3    commission of the commitment offense as well as the length of time he spent in substance abuse

4    programs.  "Circumstances which taken alone may not firmly establish unsuitability for parole

5    may contribute to a pattern which results in a finding of unsuitability."  § 2402(b).  Though his

6    criminal history is non-violent, it is lengthy.  The Governor found that Petitioner's "long and

7    deplorable criminal history [was] a negative factor weighing against his parole."  The Governor

8    noted that Petitioner was abusing drugs and alcohol prior to and during his commitment offense.

9    "[T]he importance attached to any circumstance or combination of circumstances in a particular

10   case is left to the judgment of the panel."  § 2402(c).  The Governor further supported his

11   decision by discussing Petitioner's recent failure to participate in substance-abuse programming.

12   *See Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (holding that where the decision to

13   deny parole was based on the nature of the commitment offense and was supported by

14   psychiatric reports and records recounting Petitioner's failure to complete necessary

15   programming while in prison, there was sufficient evidence to support the denial and affirm the

16   state court's decision).

17        The record shows that the Governor considered the circumstances set forth in § 2402(d)

18   that tend to show suitability for parole release including the facts that Petitioner had not been

19   charged with a disciplinary infraction in 10 years, and that his progress in prison had improved.

20   In fact, the Governor commended Petitioner for obtaining a GED and his success in vocational

21   programs.  The Governor also noted the recent positive psychological evaluations.  The

22   Governor concluded, however, that the positive factors did not outweigh the negative factors.

23   "To determine whether the some evidence standard is met 'does not require examination of the

24   entire record, independent assessment of the credibility of witnesses, or weighing of the

25   evidence.  Instead, the relevant test is whether there is any evidence in the record that could

26   support the conclusion reached by the disciplinary board.'"  *Sass*, 461 F.3d at 1128 (*quoting Hill,*

1    472 U.S. at 455-56).  "Hill's some evidence standard is minimal, and assures that 'the record is

2    not so devoid of evidence that the findings of the disciplinary board were without support or

3    otherwise arbitrary.'"  *Id.* at 1129 (*quoting Hill,* 472 U.S. at 457).

4                                                    **C**

5            Petitioner also alleges that his due process rights were violated because the Governor is

6    not a fair or impartial decision-maker.   Petitioner argues that the Governor's decision was

7    predetermined "in reaction to the vociferous political criticisms by the State's most powerful

8    anti-parole factions."  Pet'r Mem. Supp. Pet. 32.  Petitioner presents statistics that the Governor

9    greatly reduced the number of parole grants after protests in April of 2005.   However, the

10   California Supreme Court has rejected claims alleging that the Governor was biased by a no-

11   parole policy.  It found that

12               Petitioner has not presented any evidence establishing that the
                 Governor's actual decisions reversing grants of parole by the
13               Board failed to engage in an individualized consideration of the
                 factors concerning parole suitability, or that the decisions
14               themselves reflected or relied upon any blanket policy of denying
                 parole to all murderers.  The circumstance that the Governor has
15               reversed most of the Board's decisions granting parole does not
                 establish that he follows a blanket policy of denying parole or that
16               his decision in the present case was based upon such a policy,
                 rather than upon a consideration of the factors and evidence
17               discussed in the Governor's lengthy written decision denying
                 petitioner parole.  Such reversals simply may indicate that the
18               Governor is more stringent or cautious than the Board in
                 evaluating the circumstances of a particular offense and the
19               relative risk to public safety that may be posed by the release of a
                 particular individual.

20

21   *In re Rosenkrantz,* 29 Cal. 4th 616, 685-86 (2002).  Petitioner relies on *Coleman v. Board of*

     *Prison Terms,* 2004 U.S. Dist. Lexis 29929 (E.D. Cal.), for the proposition that Petitioner's due

22   process rights were violated because "it is simply not possible for the Governor to fairly,

23   neutrally, or impartially act as the final decision-maker over the paroles of life prisoners" and

24   therefore his decision regarding Petitioner was arbitrary.  Pet'r Mem. Supp. Pet. 15.  In

25   *Coleman,* the district court found that there was sufficient unrefuted evidence to establish that

26

                                                    15

1  Governor Wilson and Governor Davis had a policy not to release parolees sentenced to life

2  imprisonment with the possibility of parole.

3      Here, Petitioner has presented no evidence that Governor Schwarzenegger was biased

4  by such a policy or political motive.  Petitioner offered a newspaper article which notes the that

5  the number of parole grants were reduced after the California Correctional Peace Officers

6  Association "staged an emotional rally on the steps of the State Capitol."  Pet'r Mem. Supp. Pet.

7  29.  Petitioner alleges "that this change directly impacted his grant of parole (and is getting

8  worse, reminiscent of the Davis era)."  *Id.*  Respondent maintains that these allegations are

9  conclusory and that the Governor considered all relevant and reliable evidence.  This Court

10  agrees.[2]

**Conclusion**

12      The Governor's finding that Petitioner is unsuitable for release on parole because he

13  poses an unreasonable risk to public safety was supported by some evidence that outweighed

14  the suitability factors based on his performance while imprisoned.  Therefore, the state court's

15  denial of his petition for habeas corpus was not "contrary to, or involved an unreasonable

16  application of, clearly established federal law, as determined by the Supreme Court of the

17  United States."  28 U.S.C. § 2254(d).

18  ///

19

20  [2]Petitioner's federal habeas petition includes a request for an evidentiary hearing.
            [F]or a post-AEDPA petitioner to receive an evidentiary hearing in
21        federal court, he must first show that he has not failed to develop
            the factual basis of the claim in the state courts: if he has failed, he
22        must meet one of the two narrow exceptions stated in the statute.
            See 28 U.S.C. §2254(e)(2)(A)-(B).  Then he must meet one of the
23        [*Townsend v. Sain,* 372 U.S. 293 (1963)] factors and make
            colorable allegations that, if proved at an evidentiary hearing,
24        would entitle him to habeas relief.
*Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005).  Petitioner never explains the legal

25  basis for his entitlement to such a hearing.  Without more information regarding Petitioner's
request, this Court cannot determine whether Petitioner is in fact entitled to an evidentiary

26  hearing.  Therefore, Petitioner's request for an evidentiary hearing is denied.

1  ///

2  ///

3  ///

4    It is therefore hereby ORDERED that Petitioner's application for habeas corpus relief is

5  DENIED.

6  ///

7  DATED: June 27, 2008

8                                                   /s/ Arthur Alarcón
                                                    UNITED STATES CIRCUIT JUDGE
9                                                   Sitting by Designation

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26